CERTIFIED COPY

A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 08-1976

BRIAN KODISH,

*Plaintiff-Appellant,*

*v.*

OAKBROOK TERRACE
FIRE PROTECTION DISTRICT, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 4620—**Samuel Der-Yeghiayan,** *Judge.*

---

ARGUED NOVEMBER 5, 2008—DECIDED MAY 10, 2010

---

Before EASTERBROOK, *Chief Judge,* and RIPPLE and
ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Illinois law grants a property right in employment to firefighters. They cannot be removed or discharged from employment except for just cause. This right attaches, however, only after a firefighter has held the position for one year or longer. Otherwise, fire districts may terminate their firefighter

employees at will. The Oakbrook Terrace Fire Protection
District terminated the plaintiff, Brian Kodish, sixteen
months after the date he was hired. During four of those
sixteen months, however, Kodish was on medical leave
due to a work-related injury. On August 12, 2004, after
a vote by the Board of the Trustees of the District, the
fire chief, Gregory J. Sebesta, met with Kodish and
offered him the opportunity to resign lest he be termi-
nated immediately. Kodish signed a letter of resigna-
tion. He subsequently sued the District, Chief Sebesta, and
the three members of the Board of Trustees of the
District—Joe Dragovich, Andy Sarallo, and Donald
Ventura—alleging that they violated his due process rights,
violated his First Amendment rights by terminating him
for engaging in pro-union speech, and wrongfully termi-
nated and defamed him under Illinois state law. The
district court granted summary judgment for all defen-
dants on the due process and First Amendment claims and
declined to exercise supplemental jurisdiction over the
state law claims. Kodish appeals only the federal law
claims.

## I.

The District hired Kodish as a full-time firefighter/
paramedic on June 2, 2003. After three months of work,
he received a mediocre written evaluation, in which
he earned a rating of "good" for personal appearance
and job knowledge, and "fair" in all other areas—skill
level, initiative, quality of work, performance on calls,

and overall impression.[1] (R. at 60, Ex. F). Although the evaluator stated, "I believe Brian will be a good addition to the full time force," signs of trouble were already brewing. *Id.* The evaluator warned Kodish to focus on his job activities and put aside "administrative functions" for later in the evening. *Id.* The evaluation noted that these activities were "caus[ing] a disturbance within the shift." *Id.* This evaluation was also spotted with references to his lack of internal motivation and his need to improve his skills. *Id.* On his next evaluation, his grades dropped a bit, and he received a "good" grade only for personal appearance; in all other areas he rated only "fair." (R. at 60, Ex. G). Although the narrative described limited improvement in some skills, it noted, once again, that Kodish had a tendency to become distracted by "administrative functions" and duties or

---

[1]  In evaluating a summary judgment case, we take the facts in the light most favorable to the plaintiff, but we need not ignore the unflattering aspects of the performance evaluations. Kodish relies on those same evaluations to support his assertion that he was capable of performing adequately, and he contests neither the authenticity nor the content of those reviews. *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 367 (7th Cir. 1997) (explaining that on summary judgment the court will not ignore facts in the record merely because they are unfavorable to the non-movant; the non-movant gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question.) Kodish's argument, as we set forth more fully below, is that, irrespective of the reviews, he was terminated for his pro-union speech.

No. 08-1976

"personal and business issues that [did not] concern" him
and that he lacked necessary focus. *Id.* The second evalua-
tion also criticized his motivation, his communication
skills, and his ability to follow authority and accept
criticism. *Id.* The third review, written just one month
later, on December 11, 2003, revisited these concerns
and concluded that Kodish's "continued employment
with the District is being questioned." (R. at 60, Ex. H).

Later in December, Kodish injured his knee in a work-
related incident and when that injury required surgery,
he went on medical leave from March 21 to July 24,
2004—a period of approximately four months. One
month before going on leave, Kodish received a formal
reprimand for failing to properly shut down a medical
vehicle. Three days before going on leave, Kodish
received his fourth and final evaluation. In it his grade
for quality of work went from "fair" to "good" but
the comment noted he lacked initiative and would "only
do what he is told and no more." (R. at 60, Ex. I). Although
the evaluation noted improvements in several areas, it
repeatedly criticized Kodish's lack of initiative. *Id.* His job
knowledge still rated "below average" and he had
"not demonstrated any initiative to improve upon these
identified deficiencies." *Id.* The review again noted that
Kodish was outspoken, and that he needed "to learn how
to respect his co-workers and [s]upervisors." *Id.* On the
upside, the evaluation acknowledged that Kodish's
overall performance had improved and that he had the
potential to be a valued employee "if he would choose
to do so." *Id.* As with the previous three evaluations,

Kodish left the "employee's comments" section of the form blank.

Several weeks into Kodish's leave, on May 5, 2004, the District sent him a letter notifiying him that it was extending his probationary period pursuant to the District's Wage and Benefit Policy which purported to allow such extensions. That policy stated:

> All new employees . . . shall be considered probationary employees until they complete a probationary period of twelve (12) months, provided that the probationary period may be extended if the employee is absent from duty for a period of more than thirty (30) calendar days continuously or more than thirty (30) duty days in the aggregate. In such event, the employee's probationary period may be extended for an additional period sufficient to make up for the lost work time but not to exceed ninety (90) calendar days. During an employee's probationary period the employee may be suspended or terminated at the sole discretion of the employer.

Oakbrook Terrace Fire Protection District Employee Wage and Benefit Policy for Full-Time Commissioned Employees, 2003-2004, Article I, Sec. 2. (R. at 60, Ex. B, p. 1).

According to the letter, the District opted to extend his probationary period "until such time as a complete twelve (12) month probationary period, excluding the period of absence, has been successfully completed." (R. at 60, Ex. P). The District did not announce a date, but according to the policy cited, Kodish's probationary

period could have been extended by ninety days and thus his probationary period would have terminated sometime on or around August 31, 2004.[2]

On August 11, the Board members discussed Brian Kodish in a closed session meeting. The tenor of the discussion, which we set forth more fully in section II., B., was that Kodish was capable of performing the work of a firefighter, but that his attitude, opinions, and inter-personal conflicts were disruptive to the fire department. Kodish interprets the complaints about these latter factors to be indications that the Board members voted to terminate his employment due to his pro-union views—a claim we will investigate in more detail below.

One day later, on August 12, 2004, Chief Sebesta handed Kodish a letter of resignation and informed him that he could resign or be terminated immediately.

---

[2] The exact date is somewhat unclear as the letter and wage policy announce different policies on the extension of probationary periods. Kodish was absent for 125 days and the letter appears to extend the probationary period for the entirety of that absence: "your probationary period is deemed to be extended during the period of time in which you remain absent from duty. Upon returning to duty as a firefighter/paramedic, your probationary period will re-commence, until such time as a complete twelve (12) month probationary period, excluding the period of absence, has been successfully completed." (R. at 60, Ex. P). The employee manual, however, capped the extension at ninety days. We need not resolve the conflict, as the District voted to terminate Kodish prior to the end of a ninety-day extension.

According to Kodish, Chief Sebesta announced that Kodish had taken a day of sick leave to which he had not been entitled. Kodish also alleges that Sebesta cajoled him into signing the letter by offering to pay his insurance for the rest of the year and by telling him that he otherwise would not receive unemployment benefits—assertions Kodish maintains are false.

Kodish signed the resignation letter and later sued the District in the federal court below, alleging that the District violated his federal due process rights by terminating him without due process in violation of 42 U.S.C. § 1983, that he was fired for his unionizing activity in violation of his First Amendment rights, and that the defendants violated state law in two other claims that Kodish has not appealed to this court. The district court concluded that Kodish was a probationary employee without a protectable property interest in his employment, and that no reasonable trier of fact could conclude that Chief Sebesta exhibited anti-union views at the closed session or that the defendants terminated Kodish's employment because of his alleged pro-union views. Consequently, the district court granted summary judgment for the defendants, a decision which we review *de novo. Brunker v. Schwan's Home Serv., Inc.,* 583 F.3d 1004, 1007 (7th Cir. 2009).

## II.

### A.

To establish a federal due process claim, Kodish must demonstrate that he had a legitimate expectation of

continued employment with the District which was bestowed upon him either by a statute or by specific contractual language that limited the discretion of the District to discharge him. *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009). State law defines the property interest, and federal law defines the process that is due. *Goros v. County of Cook*, 489 F.3d 857, 859 (7th Cir. 2007). In this case, the Illinois Fire Protection Act (the Act) contains language that limits the discretion of the District to discharge its employees, and thus defines a property interest. The question in this case, however, is whether that language applies to Kodish.

The District and Trustees assert that this court must consider not only the Act, but also the Illinois Municipal Code (the Code), and the District's policies in assessing Kodish's due process claim. Whatever the District's own policy may announce about probationary periods, the District's policy is just that—its own policy, and, if in violation of Illinois law, it holds no force. And because, in cases of conflict, the Act takes precedence over the Illinois Municipal Code (*see* 70 ILCS § 705/16.01), the logical place to begin our analysis is with the Act.

That Act undoubtedly creates a property interest in continuing employment except in cases where an employer has just cause for termination. 70 ILCS § 705/16.13b. It grants that interest, however, only to those who have "held that position for one year." *Id.* Prior to that time, firefighters can be fired at will. The Act does not use the word "probationary" in describing the time period—only the phrase "held that position for a year"—although the term "probationary employee"

appears to be part of the normal parlance in the firefighting community and does appear elsewhere in the Act.[3]

No one disputes that at the time Kodish was hired, on June 2, 2003, he was an at-will employee and the Board of Trustees could have terminated his employment without just cause (provided, of course, that the reasons for termination were not otherwise illegal). The initial dispute in this case centers on whether or when he obtained the property interest in employment afforded by the Act. Ordinarily, the calculation would be simple. The Act grants an interest for employees who have "held that position for one year." 70 ILCS § 705/16.13b. According to Kodish, as of June 2, 2004, he had held his position for one year as required by the Act, and could no longer be terminated at will. But the facts here are not so simple. Although Kodish was hired on June 2, 2003, he was on leave for a work-related injury from March 21 to July 24, 2004—a period of approximately four months. In short, Kodish's due process claim turns entirely on what it means to "hold a position" as a firefighter. Does holding a position require that a person actually perform the duties of that position uninterrupted (or at least not interrupted for a

---

[3] *See, e.g.,* 70 ILCS § 705/16.13b "Notwithstanding anything to the contrary in this Section, the probationary employment period limitation shall not apply to a fireman whose position also includes paramedic responsibilities during which time the sole reason that a firefighter may be discharged without a hearing is for failing to meet the requirements for paramedic certification."

period of four months), or does it merely require that one possess or occupy the position, as the plain language might suggest?[4] There are no Illinois cases that have directly interpreted the "held that position" language of this Act. Consequently, the defendants urge us to look at the policy considerations that underlie an interpretation of "hold that position" as either performing the functions of the job for twelve months or having been hired for the position more than twelve months before.

The "performs the job" interpretation has much to commend it. After all, the purpose of the trial period is to judge firefighters on their mettle in the line of duty rather than simply on a series of examinations prior to employment. As the Illinois Supreme Court has stated,

> [b]ecause of the very nature of the duties of firemen and policemen, in the performance of which the highest courage in dangerous situations is a prime requisite, we think the Legislature must have intended that the ability to pass a written and physical examination should not be the final test. It is only through probationary appointments for a reasonable period, during which firemen and policemen may be observed in the actual performance of their duties

---

[4] *See* Oxford English Dictionary (2d Ed. 1989): "Hold: . . . 6b. To possess, have, occupy (a position, office, quality, etc.). *See also* Webster's New Universal Unabridged Dictionary (2d ed. 1983): "Hold: . . . 5. To have and keep as one's own; to be in possession of; own; occupy; as he *holds* the office of mayor."

in situations of danger, that their real worth and mettle may be tested.

*Romanik v. Bd. of Fire and Police Comm'rs of E. St. Louis*, 338 N.E.2d 397, 399 (Ill. 1975). This language, upon which the district court placed great emphasis, certainly expresses Illinois' policy reasons for maintaining a probationary period. It does not, however, answer the question as to how long that probationary period must be and whether it can be interrupted for any particular period of time.

Reading "held that position" to require performance of all of the functions of the position uninterrupted certainly would further the policy enunciated in *Romanik* of allowing fire districts to vet thoroughly their potential employees before committing to their continued employment. But there are ample reasons for the alternative rule as well—that is, a rule that grants a property right in employment to anyone who was hired into the position more than twelve months before. Perhaps the legislature did not want to grapple with the messy details of figuring out what it means to work for one year. Suppose a firefighter misses two weeks of work, or two days. Has she worked the full year? Because many firefighters work twenty-four hour shifts followed by forty-eight hours of off-duty time, if a firefighter misses two shifts, has she missed six days of a typical laborer's work? Because firefighting poses frequent and grave dangers, should a firefighter who is injured on the job be punished for the injury by having the probationary period extended? The legislature certainly must have recognized the strong

possibility that an illness or injury might prevent a firefighter from performing firefighting duties for some time during the probationary period. It easily could have accommodated this possibility by using language to limit the property interest to those who have performed the duties of the job for one year. It did not. Instead, it chose to grant certain interests to those who have "held that position" for one year. 70 ILCS § 705/16.13b.

The district court—taken with the policy argument that an employer ought to have the opportunity to observe the firefighter in action for one year and, reciprocally, that the firefighter ought to have a year to prove his worth—concluded that "[i]n a situation such as this case, where the employee is absent for a significant period of time through no fault of the employer, and the employer extends the probationary period in order to properly assess the employee's work, the employee would need to await the protections of Section 705/16.13b until he has completed his probationary period." (R. at 115, p. 13). The district court, however, failed to consider the opposing policy considerations, and, more importantly, to consider relevant guiding Illinois law.

In short, policy rationales offer no clear choice and, in any event, have been too hastily considered. It is true that the Illinois courts have not interpreted the term "held that position" in this portion of the Act, but the Illinois courts have addressed what it means to "hold a position" in similar contexts. In fact, the Illinois Supreme Court has explicitly addressed what it means for a police

officer to "hold a position" and the Illinois Appellate Courts have applied that holding to firefighters (albeit not while interpreting this particular section of the Fire Protection District Act). *People ex rel. Siegal v. Rogers,* 73 N.E.2d 316 (Ill. 1947); *Rinchich v. Vill. of Bridgeview,* 601 N.E.2d 1202 (1st Dist. 1992). These cases (not previously cited by either party or the district court) conclude that a person "holds the position" of a municipal officer "by virtue of a colorable appointment coupled with performance of the duties of the position and remuneration therefor." *Siegal,* 73 N.E.2d at 321; *Rinchich,* 601 N.E.2d at 1215.

The *Rogers* case dates back to the mid-1930s when small towns, like the Village of Skokie, Illinois, did not have official police departments. The Village president orally appointed the plaintiff, Officer Siegal, in 1934. He never filed an oath of office or bond with the Village clerk and was not appointed by the trustees. In 1945, the Village adopted an act which established fire and police commissioners and provided that all officers and members of the police department who "held their positions for more than one year" prior to its adoption were city officers entitled to its protections, including the right to a hearing prior to termination. Specifically, the language of the Village's act stated, "No officer or member of the fire or police department of any municipality which adopts this article, *who has held that position for more than one year* prior to the adoption of this article by that municipality or who has been appointed under the rules and examinations provided for by this article . . . shall be removed or discharged except for cause, upon

written charges, and after an opportunity to be heard in his own defense." Ill. Rev. Stat. 1941, Chap. 24, par. 854 cited in *Siegal,* 73 N.E.2d at 319 (emphasis added). When, in 1947, the Village fired Siegal without a hearing, he sued. The Village defended by claiming that without having fulfilled the new statutory requirements regarding appointment and the oath, he was no more than a de facto officer who was subject to discharge at will. The Illinois Supreme Court disagreed, and in doing so announced that a person holds a position as a municipal officer by virtue of a colorable appointment, coupled with performance of the duties of the position, and applicable remuneration. *Id.* at 320. *See also Rinchich*, 601 N.E.2d at 1215 (applying the definition to firefighters, but finding that a fire prevention and training officer did not have a colorable appointment as a municipal officer); *Reilly v. Bd. of Fire and Police Comm'rs*, 336 N.E.2d 334, 338 (Ill. App. 1st Dist. 1975) (police officer whose employment pre-dated and thus was not in accordance with Fire and Police Commissioners Act nevertheless held the position as police officer and could not be removed summarily as he had a colorable appointment coupled with performance of the duties of the position and remuneration therefor); *People ex rel. Bubush v. Bd. of Fire and Police Comm'rs*, 303 N.E.2d 776, 777, 780 (Ill. App. 1st Dist. 1973) (what matters for protections of the Fire and Police Commissioners Act is whether officer held the position by virtue of a colorable appointment coupled with performance of the duties of the position and remuneration therefor, and not whether office was validly created); *but c.f. Kagann v. Bd. of Fire and*

*Police Comm'rs*, 328 N.E.2d 364, 368 (Ill. App. 2d Dist. 1975) (finding that the *Siegel* case did not purport to name those factors as the sole or essential requisites for the existence of the position).

There is no doubt that the Board appointed Kodish to his position. He also performed the duties of a firefighter and received applicable remuneration.[5] These cases, however, do not resolve the second and keystone question in this case: what happens when the performance or remuneration is disrupted? Again, however, we can look to comparable Illinois law for guidance. In *Wood v. North Wamac School District No. 186*, 899 N.E.2d 578 (Ill. App. 5th Dist. 2008), the Illinois Appellate Court faced a nearly identical dilemma. Tammy Wood worked as a full-time teacher for the school district beginning with the school term in 2001 and ending with the end of the school term in 2003. Due to a serious automobile accident, however, she was unable to work at all during the 2003-2004 school year. She returned to teach in a full-time position for the 2004-2005 school year, but the district decided to terminate her employment after that year. The Illinois School Code at the time dictated that "any teacher who has been employed in any district as a

---

[5]  Neither brief identifies whether Kodish was on paid or unpaid leave during the time in which he was unable to work due to his injury. We shall assume, from a stray reference in the record to a workers' compensation claim, that Kodish was receiving workers' compensation benefits and not a salary paid by the District during the time he was on leave. (R. at 85, Ex. D, p. 107).

full-time teacher for a probationary period of [4] con-
secutive school terms shall enter upon contractual con-
tinued school service," more commonly known as tenure.
*Id.* at 581. In holding that Wood was entitled to tenure, the
court stated, "the words in this section are clear, and are
not susceptible to more than one interpretation." *Id.* The
court then concluded that the language of the statute
plainly states that a teacher who is employed in a district
as a full-time teacher for four consecutive terms "shall" be
granted tenure. *Id.* More importantly for this case, the
court went on to explain that the legislature

> certainly recognized that there was a possibility that
> an illness or an injury could prevent a teacher from
> carrying out teaching duties during this extended
> term of probation, and it easily could have required
> probationary teachers to teach for four consecutive
> years. The legislature did not do so, and we may not
> read into the section a condition that was not ex-
> pressed by the legislature.

*Id.*[6]

---

[6] The district court and the defendants cite a much older Illinois
Appellate Court case regarding teacher tenure to support
the position that an employee does not fairly serve in the
probationary capacity if he or she is absent for long periods of
time or otherwise unable to be observed by the employer.
*See* Brief of Appellees at 14 and (R. at 115, p. 8) (citing *Kuykendall
v. Bd. of Educ.,* 444 N.E.2d 766 (Ill. App. 1st Dist. 1982)). In
that case, the teacher had served only as a part-time teacher,
substitute teacher and adult education teacher for part of
(continued...)

No. 08-1976                                                    17

The language here is similarly clear. The legislature surely could have written the Act to apply to those who had *performed* the duties or functions of a firefighter for one year. It chose not to do so and instead chose to apply the entitlement to those who "held that position for a year." We must read the plain language of the Act as the Illinois Supreme Court would, in accordance with Illinois law, without imposing additional conditions not required therein. *See id.* ("we may not read into the section a condition that was not expressed by the legislature"); *see also Estate of Bowgren v. C.I.R.*, 105 F.3d 1156, 1161 (7th Cir. 1997) (when looking to Illinois law, the federal courts interpret it as the Illinois Supreme Court would and give proper regard to other Illinois courts' rulings when the Supreme Court has not ruled on an issue unless there are persuasive indications that the highest court would decide the issue differently). At all relevant times, whether he was performing his duties or not, Kodish held his position. He maintained his badge, his uniform, his personal equipment, his employee manuals, and communicated regularly with his employer. (R. at 60, Ex. T); (R. at 85, Ex. D, p. 107). Consequently, section 16.13b of the Act granted Kodish a property interest in continued employment and he could not be discharged without just cause.

---

[6] (...continued)
her qualifying time. The court held that none of these positions satisfied the requirements of the Act that a person perform the duties of a "full time teacher" for two consecutive semesters. *Id.* at 813.

We could end our analysis here, but the defendants
maintain that we must also consider the Illinois Municipal
Code and the District's Wage and Benefit Policy—both of
which, the defendants argue, allow for extensions of the
time period in section 16.13b of the Act. In 2004, and at all
times that Kodish was employed by the District, the
Municipal Code stated that probationary time limits
would not apply to firefighters who, like Kodish, also
had paramedic responsibilities. Specifically, the
Municipal Code stated:

> No municipality having a population less than
> 1,000,000 shall require that any fireman appointed to
> the lowest rank serve a probationary employment
> period of longer than one year. . . . Notwithstanding
> anything to the contrary in this Section, the probation-
> ary employment period limitation shall not apply to
> a fireman whose position also includes paramedic
> responsibilities.

65 ILCS § 5/10-2.1-4 (2004) (prior to the adoption of P.A. 94-
135, eff. July 7, 2005). According to the defendants, this
provision allowed the District to extend Kodish's proba-
tionary period beyond a year. As a preliminary matter,
we note that this portion of the Code speaks of "proba-
tionary periods," while the due process provision of the
Act is directed toward those "who [have] held that posi-
tion for one year." *Compare* 65 ILCS § 5/10-2.1-4 *with*
70 ILCS § 705/16.13b. The defendants treat these two as
one and the same without explanation. Even assuming,
for these purposes, that the two are indeed the same,
the defendants misconstrue the interplay between the
Act and the Code.

No. 08-1976                                          19

If we accept the defendants' interpretation of the Munici-
pal Code, this anachronistic provision could be used to
extend a firefighter/paramedic's probationary period
indefinitely and, in essence, eviscerate one of the
primary protections of the Fire Protection District Act for
an entire category of firefighters. The district court rea-
soned that section 16.13b of the Act should and could
be read in a manner that would make it consistent with
the provisions of the Municipal Code, but mistakenly
referenced the post-2005 version of the Code. According
to the District Court, the Municipal Code provision, 65
ILCS § 5/10-2.1-4, was consistent with the Act in that it
"provides that the District can give a firefighter up to a
one-year probationary period." (R. at 115, p. 12). This is
true of the current version of the Municipal Code, but
was not true of the version of section 10-2.1-4 in play
in 2004 which erased all probationary time limits for
a "fireman whose position also includes paramedic re-
sponsibilities." 65 ILCS § 5/10-2.1-4 (2004).

This provision no longer exists; now probationary
periods can be extended only to allow firefighters who
are required as a condition of employment to be certified
paramedics, to pass the requirements for paramedic
certification. *See* 65 ILCS § 5/10-2.1-4; 70 ILCS § 705/16.13b.[7]

_____

[7] "No municipality having a population less than 1,000,000
shall require that any firefighter appointed to the lowest rank
serve a probationary employment period of longer than one
year. . . . Notwithstanding anything to the contrary in this
Section, the probationary employment period limitation may

(continued...)

Had the district court referenced the 2004 version of the Code it would have seen that the Code did indeed conflict with the Act on this point. The Act resolves this conflict by prohibiting the provisions of the Municipal Code from taking effect where they are inconsistent with the Act. 70 ILCS § 705/16.01.

The defendants argue that there is no such discrepancy because the district court correctly read the Act (70 ILCS § 705/16.13b), the Municipal Code (65 ILCS § 5/10-2.1-4), and the Wage and Benefit Policy consistently to permit the extension of the probationary period of a firefighter who misses nearly one-third of his first year of service due to injury. Our analysis above, however, has debunked two of these underlying premises. First, the Act does not permit an extension of time before its protections come to bear. Second, the 2004 version of the Municipal Code was not consistent with section 16.13b of the Act. The rest of the circular argument falls of its own weight. The Fire Protection District Act granted Kodish a property interest in his position as a firefighter, as expressed in section 16.13b, a right not revoked by section 10.2.1-4 of the Municipal Code.

---

[7] (...continued)
be extended for a firefighter who is required, as a condition of employment, to be a certified paramedic, during which time the sole reason that a firefighter may be discharged without a hearing is for failing to meet the requirements for paramedic certification." 65 ILCS § 5/10-2.1-4. The Act itself contains similar language. *See* 70 ILCS § 705/16.13b.

In so concluding, we have thus far ignored the defen-
dants' arguments surrounding its Wage and Benefit
Policy which purportedly allows the District to extend
an employee's probationary period for up to ninety days
if the employee is absent from duty for more than thirty
days. (R. at 60, Ex. B, p. 1). As we noted at the start, the
District's policy cannot trump any conclusion we reach
based on our interpretation of the Illinois law guided by
case law from the Illinois courts. Moreover, the Policy
again raises the question of whether the District's "proba-
tionary period" is the same or different than the
language of the Act which grants an entitlement to
those who have "held that position for one year."[8] It is
possible, we suppose, that the District might wish to
treat Kodish as a probationary employee for purposes
other than granting a property interest in employment.

   In sum, the Act grants a firefighter an entitlement to
continued employment in the absence of cause for dis-

---

[8]  There is also the question of conflict between the letter sent to
Kodish and the Wage and Benefit Policy. The letter Kodish
received stated that "your probationary period is deemed to
be extended during the period of time in which you remain
absent from duty. Upon returning to duty as a firefighter/
paramedic, your probationary period will re-commence, until
such time as a complete twelve (12) month probationary period,
excluding the period of absence, has been successfully com-
pleted." (R. at 60, Ex. P). As Kodish was absent for approxi-
mately 125 days, such an extension, if not in violation of
state law, would have been in violation of the District's
own policy which limited extensions to ninety days.

charge after the firefighter has held the position for one year; that is one year after the firefighter has been appointed to the job and begins to perform services for which he will be remunerated. It does not give local fire districts the authority to extend that period.

### B.

The district court granted the defendants' motion for summary judgment on Kodish's claim that he was terminated for his pro-union speech in violation of the First Amendment, concluding that there was insufficient evidence for a reasonable trier of fact to conclude that Kodish's pro-union views were a substantial or motivating factor in the termination of Kodish's employment. (R. at 115, p. 17-18).

In analyzing an employee's claims that he was penalized by an employer because of speech, we look at three factors.[9] First, the employee's speech must be constitutionally protected; second, the plaintiff must

---

[9] In the past our cases have discussed the factors involved in a "First Amendment retaliation claim." *See Milwaukee Deputy Sheriff's Ass'n v. Clarke,* 574 F.3d 370, 376 (7th Cir. 2009). Recently we have cautioned against use of the term "retaliation" to describe cases in which an employer has punished an employee for protected speech, noting that infringement on First Amendment rights occurs both when employers deter future speech as well as when they punish past speech. *Fairley v. Andrews,* 578 F.3d 518, 525 (7th Cir. 2009). *See, e.g., Crue v. Aiken,* 370 F.3d 668 (7th Cir. 2004) (First Amendment rights infringed by prior restraint from university chancellor).

demonstrate that but for the protected speech the employer would not have taken the same action; and third, the plaintiff must have suffered a deprivation because of the employer's action. *Gunville v. Walker*, 583 F.3d 979, 983 (7th Cir. 2009); *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009). Our older cases omitted the but-for causation requirement (*see, e.g., Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009), *cert. denied*, No. 09-460, 2010 WL 58407 (Jan. 11, 2010); *Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 670 (7th Cir. 2009)), but the Supreme Court has recently clarified that unless a federal statute provides otherwise, the plaintiff bears the burden of demonstrating but-for causation in suits brought under federal law. *Gross v. FBL Fin. Serv., Inc.*, 129 S. Ct. 2343, 2351 (2009); *Fairley*, 578 F.3d at 525-26.

After enunciating these factors, some of these decisions go on to discuss the burden-shifting parameters first set forth in the Title VII employment discrimination context. *See, e.g., Valentino*, 575 F.3d at 670. Whether such a burden shifting analysis survives the Supreme Court's declaration in *Gross* in non-Title VII cases, remains to be seen. *See, e.g., Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) ("While we recognize that *Gross* expressed significant doubt about any burden-shifting under the ADEA, we conclude that the but-for causation standard required by Gross does not conflict with our continued application of the McDonnell Douglas paradigm in age discrimination cases."). In this case, however, we need not concern ourselves with whether burden shifting survives *Gross,* as Kodish has set forth

a direct case of retaliation—one that does not require a burden-shifting analysis. Under the direct method, the plaintiff survives summary judgment if he can demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). The focus of the direct method of proof thus is not whether the evidence offered is itself "direct" or "circumstantial" but rather whether the evidence "points directly" to a discriminatory reason for the employer's action. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). "'Direct' proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (e.g., 'You're too old to work here.'), but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Id.* at 671. In this case, Kodish presents direct evidence (in the form of facts, taken in the light most favorable to him) that when advocating for termination to the Board of Trustees, Chief Sebesta's language communicated that he did not like Kodish's pro-union stance. The language he points to (which we discuss at length below) may require a chain of inference, but it is direct evidence nevertheless. *Id*. In short, we must assess only whether Kodish's speech was constitutionally protected; he demonstrated that but for the protected speech he would not have been terminated; and he suffered a deprivation because of the employer's action. *Gunville*, 583 F.3d at 983.

The defendants do not appear to dispute that this type of speech relating to unionizing and collective activity of

a public employee qualifies as protected speech, and we conclude that it is. *See Thomas v. Collins,* 323 U.S. 516, 536-37 (1945) (attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guarantee); *Carreon v. Ill. Dept. of Human Servs.,* 395 F.3d 786, 792 (7th Cir. 2005); *Colburn v. Trs. of Ind. Univ.,* 973 F.2d 581, 586 (7th Cir. 1992).

We also find that Kodish suffered a deprivation in the form of a constructive discharge. "When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge. In other words, constructive discharge also occurs where, based on an employer's actions, 'the handwriting [was] on the wall' and the axe was about to fall." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 409 (7th Cir. 2008) (internal citations omitted). Here, the evidence from the discussion at the closed session of the Board and from both Kodish and Sebesta's deposition testimony was clear: had Kodish not resigned he would have been terminated immediately. (R. at 60, Ex. S, pp. 47-49); (R. at 80, Ex. A. p. 161); (R. at 85; Ex. D, pp. 113-14). Both sides' evidence aligns; no reasonable trier of fact could find that Kodish was not constructively discharged.

Consequently, the only remaining dispute centers on whether the District would have terminated Kodish but for his pro-union speech. The defendants maintain that Kodish was terminated due to poor job performance, his failure to follow the chain of command, and his inabil-

ity to get along with other firefighters. For purposes of summary judgment, however, we look at the facts and make all reasonable inferences in the light most favorable to Kodish. *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009).

During Kodish's sixteen months with the District, his reviews were a mixed bag. It is true, as Kodish points out, that his reviews contained some scores of "good" on job knowledge and quality of work, and some legitimate praise, but these same evaluations were, in toto, mediocre at best. (R. at 60, Exs. F-I). In his first evaluation, for example, he received a score of "good" for job knowledge and personal appearance, but received only "fair" grades for skill level, initiative, quality of work, performance on calls, and for "overall impression." (R. at 60, Ex. F). In his next review his grades dropped; he received a score of "good" only for personal appearance and "fair" for all other categories. (R. at 60, Ex. G). The remainder of the evaluations continued in the same mediocre vein. The comments in these job evaluations reflect a common theme of poor interpersonal skills, and mixed reviews on job knowledge and skills. Each of the four evaluations contain some admonition to focus on "establish[ing] a positive relationship with coworkers" and to "accept constructive criticism more readily." (R. at 60, Exs. F- I). There are numerous references to poor interpersonal skills, to the fact that Kodish was a busybody, a know-it-all, disrespectful of his peers, and did not accept criticism well. There were also references to the fact that his work skills were scraping the bottom of the

barrel, that they did not meet the "high standard" expected
of Oakbrook Terrace firefighters, and that he lacked
initiative and motivation. *Id.*

On top of the reviews, other signs of trouble
peppered his employment with the District. In
November 2003, less than six months after he joined the
District, Kodish had a discussion with another fire-
fighter that nearly turned to blows when, as reported
by Kodish himself, he told the co-worker that he "didn't
know the definition of the term respect." (R. at 85, Ex. D,
p. 47). According to Kodish, the other firefighter then
tried to "jump across the table at me," at which point the
captain on duty called the Chief. *Id.* The following month,
another fellow firefighter wrote to the Chief to document
an incident in which that firefighter claimed that Kodish
had confronted and then threatened him. (R. at 60, Ex. J).
In his deposition Kodish admitted yelling, "You stabbed
me in the back" and telling the other firefighter "not to do
it again," but testified that he did not recall any other
details of the incident. (R. at 60, Ex. D, pp 24-25, 60-61).

Kodish claims, however, that none of this is relevant,
as Chief Sebesta mentioned neither the job evaluations
nor their content to the Board when the Board met in
closed session to discuss Kodish. (Reply brief at 4-5). This
is not, however, entirely accurate. Chief Sebesta began
the closed session meeting by noting that Kodish had
been through three complete review sessions and
Sebesta stated that he was giving "a quick synopsis as far
as how this employee is adapting, modifying, addressing
the needs set forth by the Board of Trustees/Commis-

sioners." (R. at 60, Ex. S, pp. 4-5). He then stated that he
would be passing around the evaluations. *Id.*

Those evaluations certainly contain ample evidence to
support a conclusion that Kodish was terminated for
legitimate reasons. Kodish claims, however, that what-
ever complaints the District had about his interper-
sonal skills and work performance, his employer's true
motive in dismissing him was to silence his pro-union
views.

No one disputes that Kodish was an advocate for union-
ized firehouses. Kodish spoke freely to his co-workers
and to the Chief about his pro-union views. He spoke so
frequently that Chief Sebesata asked the District's legal
counsel to determine whether the Illinois Public Labor
Relations Act allowed a fire district of Oakbrook Terrace's
size to have a union. According to Sebesta, the lawyer
drafted a letter indicating that the District "cannot
become union" (R. at 80, Ex. A, pp. 71-72). The parties
do not cite to the lawyer's opinion letter in the record
and our search has failed to uncover it, so we do not
know whether the lawyer stated that the District "could
not" or "need not" have a collective bargaining unit.
Most of the testimony in the record implies that the
District was told, or, at the least, thought it had been
told the former. It is true that at the relevant time, the
Illinois Public Labor Relations Act did not apply to units
of local government employing less than thirty-five em-
ployees. 5 ILCS § 315/20 (2004) (2004 Ill. Legis. Serv. P.A.
93-1080 (H.B. 2577)). At the time the District employed less

than thirty-five employees.[10] The District's lawyer, there-
fore, was correct that the District had no *obligation* under
the Act to honor a collective bargaining unit or agreement.
At the same time, however, the District was not *prohibited*
from entering into a collective bargaining agreement
with its employees. The Illinois Public Labor Relations
Act contains an "exclusive exercise" clause (5 ILCS
§ 315/15) but the District, we have already established, was
not subject to the Act. (5 ILCS § 315/20). Certainly the
Illinois Public Labor Relations Board could not certify
any bargaining unit and could not become involved in
the collective bargaining process or disputes between
the District and any union the District employees chose
to join or form. Employees who are not covered by the
Illinois Public Labor Relations Act, however, are not
prevented from joining a union and the District is not
prohibited from interacting with that union. *See Metro.
Alliance of Police v. Ill. State Labor Relations Bd.*, 701
N.E.2d 825, 828 (1998). Thus, although it is true that the
District could not have "unionized" in the ordinary
fashion, through the processes outlined in the Illinois
Public Labor Relations Act and using the machinery of
the Illinois Public Labor Relations Board, Kodish had
the right to join a union or to organize his fellow
firefighters into a collective bargaining unit and to
work to convince the District to bargain with a group rep-
resentative over wages and benefits, even if the District
had no obligation to engage in collective bargaining.

---

[10] The state legislature subsequently lowered that number to
five employees. The District is now a union shop.

It is important to note that Kodish need not have
proven that he was advocating for a right that the law
compelled the District to recognize. A public employee
is not required to prove the truth of his speech in order
to secure the protections of the First Amendment.
*Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933,
942 (7th Cir. 2004); *Pickering v. Bd. of Educ.*, 391 U.S. 563,
574 (1968). Speech of public importance only loses its
First Amendment protection if the public employee
knew it was false or made it in reckless disregard of the
truth. *Gazarkiewicz*, 359 F.3d at 942. There is no evidence
in the record of either condition. Once a court deter-
mines that the speech is protected as a matter of public
concern, a court balances the interests of the employee,
as a citizen, in commenting upon matters of public
concern against the interest of the State in operating
efficiently and effectively. *Id.* at 940; *Pickering*, 391 U.S. at
568; *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Garcetti v.
Ceballos*, 547 U.S. 410, 419 (2006). It is at this step that
the veracity of the employee' statements might matter.
If, for example, the District was forbidden from nego-
tiating with a collective bargaining unit and Kodish
spent his days haranguing his supervisors and co-
workers, insisting that the District must immediately
engage in collective bargaining with a union (and did so
without knowing or recklessly disregarding the truth),
the value of his speech would be low. The cost in terms of
disruption to the efficient firefighting operation, on the
other hand, would be great.

In this case, however, Kodish's unionizing efforts were
not per se futile and certainly not illegal. Furthermore,

the record does not reveal entirely whether Kodish's pro-union views were simply generalized statements about the benefits of unions (which, even if unionization was forbidden, have some value greater than zero in a balancing inquiry) or whether he advocated that the District should recognize and bargain with a union even if the law forbade it (which, as we have said, has minimal value).[11] It certainly seems as though Kodish's statements contained more generalized "unions are

---

[11] We know very little specific detail about the nature of Kodish's speech. Chief Sebesta testified that, "Brian was very much pushing for a union," (R. at 80, Ex. A. p. 74, lines 1-2) and that Kodish had told him that "[t]hey are working on legislation to switch things [to change the number of employees needed to be covered under the Act]." (R. at 80, Ex. A. p. 75, lines 11-12). Kodish testified "I'm a strong believer in unions. . . . I have shared my beliefs with people. I don't hold back." (*Id.*, p. 29, lines 14-20); "I told him [Sebesta] what I thought about unions." (*Id.* at p. 30, lines 18-19); "Me and Mike Kus were discussing unions one day. Kus also lead me to believe he was a strong supporter of unions, and we had approached another kid on the Department to actually ask somebody else what his views were on unions." (*Id.* at p. 31, lines 2-6); "I may have said something to the effect that, you know, unions are good if benefits are being taken away." (*Id.* at p. 32, lines 16-18). The "Summary of Employment" document created by Chief Sebesta noted, "[Kodish] further indicated to Chief Sebesta that the whole situation was blown out of proportion and that it is his opinion that a union would be good to have in place if the Board of Trustees decided to take benefits away from its' [sic] Full Time employees." (R. at 74, Ex. B, ¶ 11).

good" messages. Of course, Kodish was not limited just to a generalized statement about the benefits of unions. The First Amendment would protect a wide range of advocacy including statements like, "this District would be much better off with a union;" "fire fighters who don't unionize are fools;" "we need to press the legislature to change the law;" "does anyone else here think unions are a good idea?" "It's possible the lawyer's opinion is wrong." In any event, it is premature to place a value on Kodish's speech for balancing purposes. The District does not claim that Kodish's union advocacy was disruptive to the efficient operation of the District; it argues that Kodish's termination had nothing to do with his pro-union views. See Brief of Appellees at 22, 23 ("his pro-union speech played no role in his employment decision;" "A review of the entire transcript of the closed session discussion of Kodish's performance during his probationary period does not indicate that his pro-union speech was even considered as a reason to discharge him.")

Kodish points to several comments that he alleges Chief Sebesta made as evidence that Kodish's pro-union views motivated Sebesta and the Board to fire him. The first, Kodish claims, occurred early in Kodish's tenure as he sat and talked with the Chief about unions. According to Kodish, Sebesta stated he did not like unions because "you have to live and die by the rules." (R. at 85, Ex. D, p. 30). Kodish then claims that on the day he was given the choice to resign or be terminated, Chief Sebesta told him that he had taken a sick day to which he was not entitled, and said, "Well, you're going to live or die by the rules." (*Id.* p. 112). From this, Kodish

concludes that the repeated use of the phrase shows a
clear connection between Chief Sebesta's animus
toward unions and Kodish's termination. As further
evidence of an anti-union animus, Kodish points to
Sebesta's deposition testimony wherein the Chief states
that "Brian was very much pushing for a union" and later
admits his view that "the issue related to the union"
should not be discussed in the firehouse, at least after the
District's counsel had issued an opinion stating that the
District was not eligible to have a union. (R. at 80, Ex. A,
pp. 74, 105). The district court dismissed Kodish's con-
clusion garnered from this evidence by crediting
instead Sebesta's deposition testimony in which he
stated that he "had no problems with unions,"(R. at 115,
p. 16) (citing R. at 80, Ex. A, p. 71). This amounted to
improper weighing of the evidence. *See Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 255 (1986) (on summary judg-
ment a court may not make credibility determinations
or weigh the evidence); *Payne v. Pauley*, 337 F.3d 767, 770
(2003) (summary judgment cannot be used to resolve
swearing contests between litigants).

Kodish also points to a document prepared by Chief
Sebesta entitled, "Summary of Employment Brian R.
Kodish." That document contained fifty-five entries.
According to Kodish, six of those items related to
Kodish's organizing activity. More accurately, two of
those items directly related to Kodish's organizing activ-
ity. Item four stated, "On August 20, 2003, [Chief Sebesta]
was approached by [Firefighter Kurlya] indicating that he
was approached by [Kodish] requesting that [Kurlya]
contact [Firefighter Gilleran] to get his viewpoint in [sic]

No. 08-1976

[Kodish] pursuing a Collective Bargaining Unit amongst
the Full Time employees." (R. at 74, Ex. B, ¶ 4). Item 11
stated,

> September 12, 2003, [Chief Sebesta] advised [Kodish]
> of the opinion letter . . . relating to Collective Bargain-
> ing Statute. Chief Sebesta further indicated to [Kodish]
> that if there are issues of this magnitude to address
> them directly to the Fire Chief and not get other
> employees involved with issues that they can not
> [sic] render a decision on. [Kodish] further indicated
> to Chief Sebesta that the whole situation was blown
> out of proportion and that it is his opinion that a
> union would be good to have in place if the Board of
> Trustees decided to take benefits away from its' [sic]
> Full Time employees.

(R. at 74, Ex. B, ¶ 11). The remaining four union-related
entries in the employment summary describe the process
by which Chief Sebesta requested a legal opinion on the
Illinois Public Labor Relations Act and its applicability
to the District.

Finally, Kodish claims that Sebesta was so disgruntled
by his pro-union stance that Sebesta took it upon himself
to mention it to an assistant fire chief from another town
who called for a reference. That fire chief testified that
Chief Sebesta told him that Kodish had discussed union-
ization with District personnel. (R. at 60, Ex. Q, pp. 37-39).[12]

---

[12] The district court dismissed this testimony because the
deponent, Clinton Johnson, "did not even have an independent
recollection of the conversation and indicated that it would
(continued...)

Kodish argues that "the totality of reasons for the job action against Kodish are found in the transcript of the closed session meeting of the Board of Trustees." (Kodish Reply Brief at 4). For this reason, we turn particular attention to the transcript of this closed session. In particular, Kodish claims that Chief Sebesta made numerous complaints about Kodish's union activity to the Board. Kodish's opening brief highlights one of those comments: "if you look at as far as the summary of employment, there's a lot of activity right off the bat then." (R. at 60, Ex. S, p. 24). Kodish claims that the "early activity" references Kodish's union activities noted in paragraphs 4, 5, 6, 7, 8, and 11 of the summary of employment described above.

---

[12] (...continued)
have no impact on hiring decisions." Johnson's testimony, given while referring to the notes he had made at the time he spoke with Sebesta, was certainly admissible under Fed. R. Evid. 803(1) or (3), and, as such, was an acceptable method for Kodish to present evidence of a disputed material fact. *See Payne*, 337 F.3d at 773; *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (2002) (evidence presented to defeat summary judgment need not be in admissible form, but it must be admissible in content). Furthermore, whether the conversation had any impact on Johnson's hiring decision was irrelevant. The statement was offered as evidence of Chief Sebesta's anti-union motivation for terminating Kodish and not as evidence that Johnson's Homewood Fire Department considered Kodish's union activity in its employment decision.

       

It is true that several of Chief Sebesta's comments at the closed session could be construed as references to Kodish's attempts to form a union. He noted that Kodish "caused unrest for co-workers." (R. at 60, Ex. S, p. 5); that "it's all the imperative nonsense that brings the organization down" (*Id.* at p. 18); and there was a "constant challenge of authority." (*Id.*). Chief Sebesta also discussed at length Kodish's challenge to corporate counsel's opinion that the District was not legally eligible for collective bargaining. He stated as follows:

> We've received corporate counsel review of a question that was approved by the Board of Trustees regarding collective bargaining. And once that person was privy to that information still challenged myself, you, counsel, based on his response, which has no bearing as far as that person himself. . . . Came back and made a complete mockery. Basically said to corporate counsel, had no idea what he was talking about.

*Id.* at pp. 18, 22-23.

The district court reviewed the statement that Kodish caused "unrest" and concluded that "it is clear that Sebesta was indicating that Kodish was causing uncertainty and unrest by his failure to follow the chain of command, his disregard of the rules, and the disruptions that he caused at work." (R. at 115, p. 15). In response to the comments that Kodish "brings the organization down" and he posed a "constant challenge of authority," the district court again concluded that "it is clear that such statements refer to Sebesta's extensive references to Kodish's inability to get along with other firefighters, to

be a team player, or follow rules or the chain of command." (R. at 115, p. 15). When reviewing the discussion about Kodish's challenge to counsel's opinion on union organizing, the district court again found it "clear" "that the statement by Sebesta is a reference to Kodish's failure to follow the rules or command structure." *Id.*

It is certainly true that Chief Sebesta's comments demonstrate that Kodish ruffled the Chief's feathers by challenging the legal opinion letter. There are at least two possible explanations for Sebesta's ire, however. The first is that Sebesta hated unions and was angry that Kodish continued on his quest for a union. The second is that Sebesta viewed the challenge as yet another example of Kodish's penchant for challenging authority and his inability to follow the chain of command. The district court found it "clear" that it was the latter and concluded that "no reasonable trier of fact could conclude that Sebesta exhibited anti-union views at the closed session or that Sebesta terminated Kodish's employment because of Kodish's alleged pro-union views." (R. at 115, p. 15).

The district court's interpretation is certainly a plausible conclusion from the evidence and were we reviewing the court's conclusion with deference, after a full airing of the facts, we could confidently affirm. On summary judgment, however, a court may not weigh the evidence, or decide which inferences to draw from the facts. *Payne,* 337 F.3d at 770. The temptation is often difficult to resist in cases where the facts and inferences appear to lead more strongly to one conclusion than another. *Id.* On summary judgment, however, "the court

has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Kodish's claims that Chief Sebesta wanted to get rid of a pro-union organizer are not so incredible or implausible, however, that a reasonable jury could not find in his favor. *See Payne*, 337 F.3d at 773.

The district court concluded that Kodish was asking the court to make unreasonable inferences. (R. at 115, p. 16). It is true that a plaintiff cannot thwart summary judgment by asking a court to make inferences based on flights of fancy, speculations as to the defendant's state of mind, hunches, intuitions or rumors about matters remote from that experience. *Payne*, 337 F.3d at 772. Kodish could be mistaken that Chief Sebesta had an anti-union animus, but his theory is supported by more than mere inference or speculation about Sebesta's state of mind. Kodish presented concrete evidence of comments Sebesta made in the recorded closed meeting, in his deposition testimony, and in a conversation with another fire chief who spoke with Sebesta. *C.f. Paz v. Wauconda Healthcare and Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006) (plaintiff's deposition testimony based on personal knowledge created genuine issues of fact that defeated summary judgment for employer in discrimination case).

The evidence of Chief Sebesta's anti-union animus is of limited use, however, unless Kodish can connect it to the District's Board of Trustees. Chief Sebesta had no ability to fire Kodish; that power belonged to the Board.

Kodish therefore has to prove either that the Board itself was motivated by the desire to punish Kodish for his pro-union speech or that the Chief exerted such significant influence over the employment decision that Sebesta's intent can be imputed to the Board. *See, e.g., Long v. Teach-ers' Ret. Sys. of Ill.*, 585 F.3d 344, 351 (7th 2009).

Whether that influence must be a singular influence is unclear in this Circuit. *See Long*, 585 F.3d at 351 ("Some cases hold that a subordinate must have a 'singular influence' over the employment decision, and others do not draw such a bright line" (internal cita-tions omitted)). A singular influence is one in which a subordinate employee possesses so much influence and power over the nominal decision maker that the employee, for all intents and purposes is in fact, the true functional decision maker. *Brewer v. Bd. of Trs.*, 479 F.3d 908, 917 (7th Cir. 2007), citing *Little v. Ill. Dept. of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004); *Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990). *See also, Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009) ("to be a cat's paw requires more; true to the fable, it requires a blind reliance, the stuff of 'singular influence.'") *cert. granted*, No. 09-400, 2010 WL 1525785 (Apr. 19, 2010). Justice Alito recently noted that the Supreme Court has never resolved the circumstances under which an employer may be held liable based on the discriminatory intent of subordinate employees who influence but do not make the ultimate employment decision. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2688-89 (2009) (Alito, J. concurring) (noting, as examples, the various approaches of the courts in *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484-88

(10th Cir. 2006); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000); and *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)).[13]

We need not decide whether the influence must be singular or whether a less demanding standard applies. In this case, all of the Board's information passed through Sebesta. The Board did not conduct its own investigation or gather any of its own information. The Board members did not interview other firefighters, administrative personnel, or Kodish himself. It is possible, and perhaps likely, that they reviewed the employment reviews and the "Summary of Employment" which Sebesta passed around at the closed session (*See* R. at 60, Ex. S, p. 5), but two of the four evaluations and the summary of employment were written by Sebesta. During that closed session, Sebesta spoke at length about Kodish with very little input or questioning from the Board members. Trustee Dragovich, for example, stated, "I take his word

---

[13] Just last month, the United States submitted an *amicus* brief in support of a petition for certiorari in *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009) in which the Solicitor General argues that the "singular influence" requirement in *Staub* was incorrect and that a court should impute liability to an employer when a biased subordinate influences but does not make the adverse employment decision. Brief for the United States as Amicus Curiae at 9, *Staub v. Proctor Hosp.*, No. 09-400 (S. Ct. March 16, 2010). The Supreme Court recently granted certiorari. *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009), *cert. granted*, No. 09-400, 2010 WL 1525785 (Apr. 19, 2010).

for it." (R. at 60, Ex. S, p. 46). Legal counsel had to remind the Board, "You'll have to move that you are designating the Chief to [terminate Kodish]. Your decision (inaudible) you're not allowing him to do it, you're telling him." (R. at 60, Ex. S, p. 47). Of course, the Board members were entitled to consider and credit the recommendation of Sebesta, the person who had supervised the employee on a daily basis, but they were required nevertheless to formulate their own opinion. *Staub*, 560 F.3d at 659.

It is a plausible inference, if not the sole inference, that Sebesta exerted a singular influence on the evidence presented to the Board and therefore even more likely that, under a less demanding standard, Kodish could convince a jury that Sebesta exerted a significant influence or provided a motivating factor for Kodish's termination. Kodish has presented sufficient evidence that but for his protected pro-union speech, the members of the Board of Trustees of the District, influenced by Chief Sebesta, would not have voted to terminate his employment.

The judgment of the district court is REVERSED.